IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

TONY HILL, SR. and TONY HILL, JR., :
                                     :
       Plaintiffs,                  :
                                       :
v.                                          :
                                       :       **No. 5:10-CV-472 (CAR)**
MACON POLICE DEPARTMENT,     :
CITY OF MACON, GEORGIA        :
OFFICER ANTOINNE JORDAN,     :
OFFICER DANIEL REDD, OFFICER   :
HOWARD STREET, OFFICER MATT   :
TOUT, OFFICER ALEX ROZIER,      :
OFFICER TRACEY STANLEY,       :
MAJOR CHARLES STONE,         :
DEPUTY CHIEF HENDERSON       :
CARSWELL, LT. MARQUETTE KING, :
LT. DOMINICK ANDREWS, CHIEF   :
OF POLICE MICHAEL "MIKE"       :
BURNS, and HONORABLE MAYOR   :
ROBERT REICHERT, all in their    :
official and individual capacities,   :
                                       :
       Defendants.               :
_____ :

## <u>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Defendants in the above-captioned matter (collectively, "Defendants") have

jointly moved this Court for summary judgment as a matter of law [Doc. 20] as to

Plaintiffs Tony Hill Sr. and Tony Hill Jr.'s (collectively, "Plaintiffs") action pursuant to

42 U.S.C. § 1983 and state law.  Having considered the relevant facts, applicable law,

and the Motion and responses thereto, Defendants' Motion for Summary Judgment [Doc. 20] is **GRANTED**.

## LEGAL STANDARD

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[1] Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.[2]  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence.[4]  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

---

[1] Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[3] *See id.* at 249-52.

[4] *See id.* at 254-55; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

believes demonstrate the absence of a genuine issue of material fact@and that entitle it to a judgment as a matter of law.[5]

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or the moving party is not entitled to a judgment as a matter of law.[6]  "A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor."[7]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[8]  Ultimately, summary judgment must be entered where Athe nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.@

## BACKGROUND

This action arises from Defendants' unfortunate misidentification and subsequent wrongful arrest of Plaintiff Tony Hill, Jr. ("Junior").  The facts, read in the light most favorable to Plaintiffs, the nonmovants, are as follows.[10]

---

[5] *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).
[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324-26.
[7] *Borton v. City of Dothan*, 734 F. Supp. 2d 1237, 1241 (11th Cir. 2010).
[8] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).
[9] *Celotex*, 477 U.S. at 323.
[10] The Court acknowledges the exceedingly difficult task of sifting through the staggering amount of contradictions within Plaintiffs' evidence, either between Plaintiffs themselves, or within their own testimony.  Out of an abundance of caution, the Court will consider the cited record as argued by

The Strike Team or Violent Crimes Task Force ("Strike Team" or "Team") is a Macon Police Department ("MPD") unit comprised of several officers who are not bound by city precinct jurisdiction.  In addition to performing the regular policing duties of any officer, the Strike Team polices high-crime areas, serves high-risk warrants, and gathers information for investigators.  On the evening of December 18, 2008, the Team included six officers: the senior officer, Officer Daniel Redd, and five patrol officers, Officers Antoinne Jordan, Tracey Stanley, Matt Tout, Alex Rozier, and Howard Street (collectively, "officers").[11]

Before beginning their evening shift, Sargent Dan Marcus briefed the Team about a suspect named "Antonio Bernard Hill" ("Antonio" or "Antonio Hill") who was believed to be in the east Macon area.  Marcus informed the Team that the MPD wanted Antonio for questioning relating to a hit-and-run vehicular homicide and that Antonio had two warrants in Florida, both of which were subsequently verified by the National Crime Information Center ("NCIC").[12]  Marcus described Antonio as a black male and gave the Team a black and white Xerox photograph of Antonio which was

---

Plaintiffs in their response and will exercise restrain to ignore the plethora of contradictions.  For a merciless rendition of Plaintiffs' contradictions, see Defendants' Motion for Summary Judgment [Doc. 20-2 at 9-17].

[11] The record indicates that Officer Mace was also a member of the Team that evening.  However, Mace is neither a defendant in the instant action nor a participant in the relevant facts.  In an effort to simplify the already convoluted facts, the Court will disregard Mace's presence for the purpose of this Order.

[12] Although it is undisputed that the NCIC informed the officers of the validity of these warrants, it is unclear who called NCIC for verification.  *See* Redd Dep. 20:8 [Doc. 33].

"really kind of hard to make out."[13]   Marcus did not provide any other identifying

information, including Antonio's height, weight, and age, of which is ordinarily

provided to MPD officers.[14]

After the briefing, the Team, outfitted in gray "tactical uniforms," headed for

east Macon in separate, marked patrol cars.[15]   While on patrol, the officers arrested an

individual nicknamed "Buck" for possession of marijuana in an unrelated traffic stop.

When Buck was in Officer Redd's patrol car, Redd showed Buck the Xerox picture of

Antonio and asked him if he knew the man in the picture, Antonio Hill.[16]   "[A]lmost

immediately" Buck acknowledged that he did but wanted to know what the officers

would do for him in return.[17]   At least one officer informed Buck that they "would

downplay" the marijuana charge.[18]   Buck responded that he knew where the suspect

lived and offered to show the officers.   With Buck's guidance, the Team followed

Officer Redd to 352 Cowan Street, a house located in east Macon.

The officers parked their vehicles along the road and surrounded the house,

assuming routine positions: Officers Street and Rozier went on the open air front

porch to knock on the front door; Officers Redd and Tout stood in the front yard at the

---

[13] Street Dep. 22:24-25 [Doc. 40].

[14] *See, e.g.,* Rozier Dep. 47:9-12 [Doc. 39]; *but see* Street Dep. 38:10-14 [Doc. 40] (recalling that Antonio's date of birth had been on the Florida booking sheet).

[15] Jordan Dep. 62:22-24 [Doc. 36].

[16] *See* Redd Dep. 31-32 [Doc. 33]; Tout Dep. 40 [Doc. 32].

[17] Redd Dep. 29:19 [Doc. 33].

[18] *See* Jordan Dep. 79 [Doc. 36].   Whether the officers made such an offer is an issue of fact in dispute.   *See* Redd Dep. 29:22 [Doc. 33].   Reading the facts in the light most favorable to Plaintiffs, the Court will presume that the officers made this agreement with Buck.

corner of the house; Officer Stanley covered the side door; and Officer Jordan went to the back corner of the house near the back door.  It is undisputed that, at this point, the officers' intention was to speak to the owner of the property, gather information about Antonio, and, absent circumstances warranting entry, leave upon the request of the property owner.  It is also undisputed that the Team did not have a warrant to enter 352 Cowan Street.

Inside the house, Plaintiff Tony Hill Sr. ("Senior") was celebrating his birthday with his son, Plaintiff Tony Hill Jr. ("Junior"), Junior's girlfriend, and two of Plaintiffs' family members, Farley Blow and Ronnie Hill.  Plaintiffs and their guests had just started dinner when Officer Street knocked on the front door.  Junior was sitting with Ronnie Hill on the sofa directly in front of the door and, being the only one who heard the knock, got up to answer it.

When Junior opened the door, Officer Street introduced himself and asked Junior if he was Antonio Hill.[19]  Junior responded, "No, my name is Antonio Hill, Jr."[20] Senior, now aware someone was at the door, went to talk with the officers and told Junior to sit down.  Junior complied and sat back down on the sofa immediately in front of the open door.  As Officer Street began to introduce himself to Senior, Senior told the officers to leave.  Officer Street reintroduced himself, and Senior repeated his request.  Officer Street ignored Senior's request and asked Senior whether Junior had a

---

[19] Street Dep. 50:12-17 [Doc. 40].
[20] Hill Jr. Dep. 32:7 [Doc. 24].

middle name and if Tony was Junior's middle name.[21]  Senior responded that Junior

did not have a middle name and restated Junior's full name: Tony Hill, Jr.

At Senior's request, Junior went into his room in the house to retrieve his high

school identification card that was at least five years old.  Because the officers were not

convinced, Junior went back into the house and retrieved a second state-issued

identification card.  Officer Street studied Junior's identification cards, comparing it to

the Xerox picture of Antonio, and Junior sat back down on the sofa in front of the open

door.[22]  It is undisputed that none of the officers saw Plaintiffs or the occupants

partaking in any illegal activity at any point in time.

While Officer Street was comparing Junior's identification to Antonio's picture,

Officers Redd, Tout, and Jordan joined Officers Street and Rozier on the front porch.

Shortly thereafter, either (or both) Officer Street or Officer Jordan pointed at Junior

sitting on the sofa and "hollered," "There go Antonio."[23]  Officer Jordan barreled into

the house to arrest Junior, bolting past Senior who was standing in the doorway.

Officers Street and Tout quickly followed Jordan into the house to assist with the

arrest.  Officer Jordan "grabbed" Junior around his neck and pushed on his upper

chest to force Junior onto the floor.[24]  Officers Street and Tout each took one of Junior's

---

[21] Street testified that he did not leave the property because of Senior's disputed aggressive mannerisms.
[22] Officer Street denies having the photo of Antonio in his possession at this time.  *See, e.g.*, Street Dep. 70 [Doc. 40].
[23] Hill Sr. Dep. 38:23 [Doc. 25].
[24] Hill Jr. Dep. 34:2, 39:7 [Doc. 24].

arms, slinging him around until he was lying face down on the floor.  As two of the officers were handcuffing Junior's hands behind his back, one of the officers put his knee onto Junior's back.  Junior neither resisted arrest nor cursed at the officers.

Meanwhile, the remaining officers, Officers Redd, Stanley, and Rozier, also entered Plaintiffs' house, pushing Senior, Blow, and Ronnie against the wall.  The officers yelled at them to stay against the wall and placed their hands on their holsters as if to draw their weapons.  It is undisputed, however, that the officers did not draw their weapons.

After Junior had been handcuffed and Senior and the other occupants, save Junior's girlfriend, were against the wall, Officer Rozier compared Junior's identification to the Xerox picture of Antonio.  Using "solely" Antonio's picture, Officer Rozier concluded that Junior was not Antonio, and the arresting officers promptly removed Junior's handcuffs.[25]  Senior testified that the officers pushed Junior onto the sofa after Junior stood up.  According to Junior, he was handcuffed for a total of five minutes.

When Officer Jordan was leaving the house, he "snatched [Senior] in [his] chest and … pulled [him] on the porch";[26] an unidentified officer, however, quickly intervened.  Once all the officers were outside, Senior asked them for their names and badge numbers.  An unidentified officer responded, "Fuck you," and snapped Junior's

---

[25] Rozier Dep. 64:24 [Doc. 39].
[26] Hill Sr., Dep. 46: 9-10 [Doc. 25].

state-issued identification card in half, leaving it on the back of Senior's car.[27]  In the yard, several of the officers cursed at Plaintiffs and their guests, threatening to "snatch [Farley Blow's and Ronnie Hill's] ass[es] out the door."[28]

<u>Plaintiffs' Physical Injuries and Emotional Distress</u>

That evening after the arrest, Junior experienced neck and back pain and went to the hospital for an x-ray of his back.  Despite never being informed whether his x-ray was "normal,"[29] Junior received "some pain reliever[s], some muscle relaxers, and stuff," and began seeing a chiropractor three times a week.[30]  For a couple of weeks following the arrest, Junior had "sharp pains shoot[ing] up and down [his] back" that prevented him from sleeping.[31]  Over a period of two years following the arrest, Junior continued to see a chiropractor three times a week and was unable to work.

In addition to those injuries sustained by Junior, Senior also testified that before the incident, he had a history of seizures, and that after the incident, he had "a few

---

[27] *Id.* at 46:23 [Doc. 25].  In their Response Brief, Plaintiffs identify Jordan as the offending officer, [*see* Doc. 29 at 6], however the citations referenced by Plaintiffs do not support this proposition.  Senior testified that he does not know what happened to the broken card, and Junior attested that he has not seen it since.
[28] Hill Sr. Dep. 48:16 [Doc. 25].  Although for purposes of this Motion, the Court accepts Plaintiffs' version of the facts as true, the Court notes that the officers' version of events differs <u>significantly</u> in many key respects.  According to the officers, Senior was immediately aggressive and was shouting and cursing at the officers.  Farley Blow was also acting aggressively and shouting and cursing at the officers, telling them they did not know who they were dealing with and that he was an ex-marine.  Junior, upon hearing commotion outside, went on the porch and started pounding his chest as if he wanted to fight.  When the officers identified Junior, he ran back into the house and resisted arrest, cursing at and fighting with the officers.
[29] Hill Jr. Dep. 59:13-15 [Doc. 24].
[30] *Id.* at 59:23-24 [Doc. 24].
[31] *Id.* at 65:25 [Doc. 24].

9

seizures" and that his seizures had gotten worse.[32]  Senior admitted however that he did not tell his doctor about his worsening condition or about the incident itself. Senior also testified that he is fearful of the police and generally distrusts them.  After the incident Senior had trouble sleeping and would "wake up, pop up and look out the windows and stuff."[33]

Disciplinary Review

The MPD maintains an Internal Affairs ("IA") office that reports directly to the Chief of Police.[34]  The IA investigates citizen complaints and allegations of misconduct involving police officers, and interviews the complainants, the officers involved, and any witnesses.  When the investigation is completed, the IA personnel complete a file and create a charge sheet.  The IA file, sent to the Disciplinary Review Board, must be reviewed by all the members of the Disciplinary Board.  If the Disciplinary Board determines that the citizen complaint is "unfounded," the Chief of Police never views the file.   Alternatively, if the Board finds the complaint to be "founded," the Disciplinary Board issues a recommendation for discipline, and the IA file goes to the Deputy Chief who briefs the Chief on the findings.  The Chief then decides whether to discipline the offending officers.  If a citizen is unhappy with the Chief's ultimate

---

[32] Hill Sr. Dep. 58:15 [Doc. 25].

[33] *Id.* at 68:15-16 [Doc. 25].

[34] To the extent Plaintiffs "do not contest" certain facts contained within Defendants' Statement of Material Facts, [*see* doc. 29-1, ¶¶ 172-182], such facts are deemed admitted for the purposes of this Motion.

decision, the citizen may appeal the decision to the Mayor and the Mayor's Citizens Review Board.

After the incident at Plaintiffs' home, a total of three filings were completed, all of which were investigated by the IA office. The first two filings were "use of force" reports submitted in accordance with standard MPD procedure for Officers Jordan and Tout. Defendant Sargent Lisa Sapp, Jordan and Tout's supervisor, recommended the reports be forwarded to IA. Sapp's supervisor, Defendant Major Stone, adopted her recommendation and subsequently sent them to IA.

The third and remaining filing was Senior's citizen's complaint which was also forwarded to IA. Several weeks after filing, Defendant Mayor Robert Reichert and Defendant Chief of Police Michael Burns talked with Plaintiffs and their attorney about the incident at Plaintiffs' home. During their conversation, Mayor Reichert told Senior that something would be done, and Senior interpreted this reassurance to mean the officers would be disciplined.

After the Disciplinary Board and IA investigated Senior's complaint and use of force reports, they determined the officers had not violated department policy and recommended no further action be taken. Deputy Chief Carswell signed off on the recommendation on behalf of Chief Burns. Plaintiffs did not appeal the decision to Mayor Reichert.

Plaintiffs commenced the instant action on November 4, 2010, in the Superior Court of Bibb County, Georgia, against the following Defendants, in both their individual and official capacities: Macon Police Department; City of Macon, Georgia; Officer Antoinne Jordan; Officer Daniel Redd; Officer Howard Street; Officer Matt Tout; Officer Alex Rozier; Officer Tracey Stanley; Major Charles Stone; Deputy Chief Henderson Carswell; Lt. Marquette King; Lt. Dominick Andrews; Chief of Police Michael Burns; and Mayor Robert Reichert.  On December 7, 2010, Defendants timely removed the action to this Court.

In their Complaint, Plaintiffs allege the following federal and state law claims: (1) deprivation of Plaintiffs' due process rights under the Fourteenth Amendment; (2) "false imprisonment" of both Plaintiffs in violation of the Fourth Amendment; (3) excessive force in violation of the Fourth Amendment; (4) suppression of Senior's right of free speech in violation of the First Amendment; (5) failure to train, monitor, and supervise MPD officers, and a policy or practice of ratifying or condoning the unlawful and illegal activity of MPD officers against MPD and the City; (6) false imprisonment under state law; (7) assault; (8) battery; (9) trespass; (10) intentional infliction of emotional distress; and (11) punitive damages.  Plaintiffs request compensatory and punitive damages in an unalleged amount, including attorney's fees and costs, and injunctive relief requiring Defendants to "delete and expunge from any and all police records or databases any information about Plaintiffs' private home

on December 18, 2008, after trial in this action"; and any other relief the Court deems appropriate.[35]

## DISCUSSION

As a preliminary matter, Plaintiffs have expressly conceded summary judgment against Defendant MPD on the grounds that it is not a legal entity subject to suit. Additionally, in their response to summary judgment, Plaintiffs voluntarily dismiss their claims against Defendants Stone, Carswell, King, and Andrews.  Accordingly, with respect to Defendants MPD, Major Charles Stone, Deputy Chief Henderson Carswell, Lt. Marguette King, and Lt. Dominick Andrews, in their individual and official capacities, Defendants' Motion for Summary Judgment [Doc. 20] is **GRANTED**.   The Court now considers Plaintiffs' claims against the remaining Defendants.[36]

## I.    Constitutional Claims

The Court's initial task is to identify the constitutional rights actually at issue in this case.  Plaintiffs assert the following relatively identifiable claims under the Fourth Amendment: unlawful seizure of Senior during the knock and talk, warrantless entry, and excessive force.  Plaintiffs also assert that their free speech was suppressed in

---

[35] [Doc. 1-2 ¶ 162(f)].

[36] With respect to the remaining Defendants, Plaintiffs do little, if anything, in the way of identifying which claim(s) are asserted against which Defendant(s).  However, in light of the Court's conclusion that all of Plaintiffs' claims fail as a matter of law with respect to all of the Defendants, such a distinction is, for the purposes of the Motion, unnecessary.  Therefore, in analyzing Plaintiffs' claims below, the Court presumes that all of Plaintiffs claims are asserted against all of the remaining Defendants.

violation of the First Amendment.[37]  More difficult to discern, however, are the three

claims arising out of Junior's arrest, Junior's seizure, and Senior's seizure during

Junior's arrest.

In their Complaint and subsequent filings, Plaintiffs refer to these claims

interchangeably as "false imprisonment" and "unlawful search and seizure/arrest

claims" under the Fourth and Fourteenth Amendments.[38]  Normally, when a false

imprisonment claim arises merely from "[a] detention on the basis of a false arrest,"

the false imprisonment claim is "subsume[d]" into the false arrest claim.[39]  In other

words, the brief detention following an allegedly unlawful arrest does not create a

separate false imprisonment claim distinct from a false arrest claim.[40]  However, in

cases of mistaken identity, as is the case here with respect to Junior, the Eleventh

Circuit has recognized a separate false imprisonment claim distinct from a false arrest

claim.[41]  In such a circumstance, a detention on the basis of a false arrest may present

both a valid false arrest claim under the Fourth Amendment and a valid false

---

[37] [Doc. 1-2 at 17].

[38] Plaintiffs also assert a Fourteenth Amendment right to due process that, although separate in the Complaint, appears to be the same as their "false imprisonment" claims.  [Doc. 1 ¶ 62-64].

[39] *Eloy v. Guillot*, 289 F. App'x 339, 347 n.3 (11th Cir. 2008) (citing *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996) (concluding that plaintiff's claim for false imprisonment is functionally indistinct from his false arrest claim)).

[40] *Id.*; *see McDaniel v. Bradshaw*, No. 10-81082-CIV, 2011 WL 1362114, at *3 (S.D. Fla. Apr. 11, 2011) (dismissed plaintiff's false imprisonment claim as subsumed by false arrest claim because plaintiff was detained briefly following an allegedly unlawful arrest); *see also Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("False arrest and false imprisonment overlap; the former is a species of the latter.").

[41] *Ortega*, 85 F.3d at 1526 (citing *Cannon v. Macon Cnty.*, 1 F.3d 1558, 1562 (11th Cir. 1993)).

imprisonment claim under the Fourteenth Amendment.[42]  Accordingly, the Court will construe Junior's "false imprisonment" claim as two separate claims: a false arrest claim under the Fourth Amendment and a false imprisonment claim under the Fourteenth Amendment.

The Court reaches a different construction, however, with respect to Senior's false imprisonment claim arising out of his alleged detention during Junior's arrest. Because Plaintiffs do not argue that Senior's claim is premised on mistaken identity or an arrest, Senior's claim is appropriately construed as an unlawful *Terry*[43]-stop—a detention unsupported by reasonable suspicion.[44]  Accordingly, the Court construes Senior's "false imprisonment" claim as a Fourth Amendment unlawful seizure claim.

A.  <u>Individual Defendants in their Individual Capacity</u>

42 U.S.C. § 1983 does not create a substantive right; instead, it provides a remedy for an individual deprived an underlying constitutional right.[45]  Thus, to "prevail in a civil rights action under 42 U.S.C. § 1983, a plaintiff must show that the defendant, under color of state law, deprived the plaintiff of a right secured by the

---

[42] *Id*.

[43] *Terry v. Ohio*, 392 U.S. 1 (1968).

[44] *Hardy v. Broward Cnty. Sheriff's Office*, 238 F. App'x 435, 440 (11th Cir. 2007) (detention claim arising from claim without a warrant can "either be a claim for an unlawful *Terry*-stop <u>or</u> an arrest lacking probable cause") (emphasis in original).

[45] *Id*.

15

Constitution and laws of the United States."[46]  The Court begins with Plaintiffs' claims that Defendants violated their Fourth Amendment rights.[47]

1. *Fourth Amendment*

Pursuant to the Fourth Amendment, a police officer must have probable cause to make a warrantless arrest.[48]  "Probable cause to arrest exists if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is committing an offense."[49]  "A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim."[50]

Plaintiffs appear to raise several Fourth Amendment claims with respect to the officers' conduct.  The Court considers Plaintiffs' claims in the order they arose on the evening of December 18, 2008.  Plaintiffs do not challenge the validity of either the officers' decision to conduct the knock and talk or the officers' decision to surround Plaintiffs' home, so the Court begins its analysis with the officers' actions during the knock and talk.

---

[46] *Barfield v. Brierton*, 883 F.2d 923, 934 (11th Cir. 1989).

[47] Given the Court's ultimate conclusion that the officers had actual probable cause and no constitutional violations occurred, the Court need not discuss Defendants' qualified immunity defense, and thus whether the officers had arguable probable cause.  *Draper v. Reynolds*, 369 F.3d 1270, 1276 n.7 (11th Cir. 2004).

[48] *Rodriguez v. Farrell*, 280 F.3d 1341, 1345 (11th Cir. 2002).

[49] *Id*.

[50] *Ortega*, 85 F.3d at 1525.

a.  Knock and Talk: Unlawful Seizure

The "knock and talk" is a warrantless, investigative tactic used by police officers to obtain information related to an investigation from people inside a house.[51]  The Eleventh Circuit recognizes the constitutional validity of this tactic: "[a]bsent express orders from the person in possession, an officer may walk up the steps and knock on the front door of any man's [home], with the honest intent of asking questions of the occupant thereof."[52]  An otherwise permissible knock and talk may become coercive "if the police assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up."[53]  Alternatively, if the officer does not find a basis for either reasonable suspicion or probable cause, and if the resident does not voluntarily consent, an officer is limited to the same extent a private citizen would be.[54]

Importantly, during the knock and talk, the officer may "learn information that amounts to full probable cause sufficient to obtain a warrant."[55]  In other words, the officers are permitted to "try to see from their vantage point at the door whether [any

---

[51] *See United States v. Tobin*, 923 F.2d 1506 (1991).

[52] *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006)

[53] *United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008); *see United States v. Ramirez-Chilel*, 289 F.3d 744, 751 (11th Cir. 2002) (holding that an officer may not gain warrantless entry to a house by way of any show of official authority); *see Taylor*, 458 F.3d at 1204.

[54] *Taylor*, 458 F.3d at 1204.

[55] *Walters*, 529 F. Supp. 2d at 638-39; *see McClish v. Nugent*, 483 F.3d 1231, 1247 (11th Cir. 2007) ("an individual who opens the door may provide an officer with more information than a person who chooses to remain behind a close door—and, therefore, may well provide an officer with a basis for finding probable cause or an exigency…").

indicia of criminal activity] is in plain view."[56]  Upon finding a basis for probable cause, the officer is not required to "end the encounter immediately."[57]  Similarly, an officer that has an objectively reasonable suspicion that a person is involved in criminal activity "may detain the individual temporarily and question him to verify or dispel his suspicions."[58]

Here, it is undisputed that the officers' intention was to conduct a knock and talk.  The officers merely intended to question the occupants of 352 Cowan Street as to the whereabouts of Antonio Hill.  At this point, the officers knew Antonio's name, sex, and race; that he was believed to be in the east Macon area; and that 352 Cowan Street, located in east Macon, could be where Antonio lived.  Further, it is undisputed that the officers did not intend to effectuate the arrest warrant without first confirming that there was reason to believe this was Antonio's residence and that Antonio was inside.[59]

With this intent, Officer Street and Officer Rozier walked onto Plaintiffs' open air front porch, and Officer Street knocked on the front door.[60]  There is no evidence that

---

[56] *United States v. Johnson*, 170 F.3d 708, 711 (7th Cir. 1999).

[57] *Walters*, 529 F. Supp. 2d at 640 (citing *United States v. Watson*, 423 U.S. 411, 449 (1976) (Marshall, J. dissenting on other grounds)).

[58] *Id.* at 639 (citing *Fla. v. Royer*, 460 U.S. 491, 498 (1983)); *Terry*, 392 U.S. at 21.

[59] *See Nordskog v. Wainwright*, 546 F.2d 69, 72 (5th Cir. 1977) ("The main consideration is to determine whether the observing officer had a right to be in the position to have that view.  Where police officers trespass in order to secure the view, the courts have not hesitated to find unwarranted intrusion."); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[60] As noted, Plaintiffs do not dispute the facts prior to the knock and talk, specifically the officers' decision to surround the house.  Accordingly, it is unnecessary for the Court to engage in an analysis of this conduct.

18

Street knocked on the door in an impatient or persistent manner; indeed, it appears that Street's knock was, for all intents and purposes, of average decibel levels (if not below average) as only Junior heard the knock.  In addition, there is no evidence that the officers, in any way, used their authority to demand that Plaintiffs open the door, especially in light of Plaintiffs' testimony that neither of them was aware the police were at the door before opening it.

When Junior opened the door, Officer Street introduced himself and asked him if he was Antonio Hill.  Junior said no and told him his name was Tony Hill, Jr.  There is no evidence to suggest that the officers were hostile or otherwise coercive while talking with Junior, that Junior felt threatened, or that he felt he was not free to leave.  To the contrary, the record indicates that Junior ended his conversation with the officers without issue at the direction of his father.

After Officer Street introduced himself to Senior, Senior told the officers to leave. Street ignored his request and again reintroduced himself, attempting to continue the investigation.  It is at this point that Plaintiffs contend Officers Street and Rozier's refusal to leave transformed the otherwise permissible knock and talk into a coerced questioning and thus, an unlawful seizure.  The Court disagrees.

Prior to Senior's request that the officers leave, Junior had already voluntarily opened the door.  During the officers' quick interaction with Junior, the officers learned that he was a young, black male, whose name was very similar to the name of the

19

suspect.  Although Junior had told the officers that he was not Antonio Hill, "the police had not yet confirmed [this] fact and still[, at the least,] reasonably suspected that he might be the wanted person."[61]   Thus, the Court concludes that the knock and talk principles of which may have dictated that the officers, like private citizens, leave immediately or discontinue their investigation upon Senior's request, no longer governed the lawfulness of the officers' activities.[62]   Instead, the consensual encounter with Junior generated the reasonable belief that Junior was the suspect and thus transformed the knock and talk into circumstances giving rise to, at the least, reasonable suspicion.   Armed with reasonable suspicion, the officers were entitled to refuse Senior's requests, detain Senior, and engage in more persistent questioning to confirm or dispel their suspicions or establish probable cause that Antonio was in the house.[63] Accordingly, Senior's Fourth Amendment seizure claim as related to the knock and talk fails as a matter of law, and Defendants' Motion as to this claim is **GRANTED**.

b.  False Arrest

The Court next considers the reasonableness of Defendants' mistaken arrest of Junior.  On summary judgment, Plaintiffs argue that Defendants made a warrantless

---

[61] *United States v. Crapser*, 472 F.3d 1141, 1147 (9th Cir. 2011).

[62] To the extent Plaintiffs rely on Street's testimony that he did not leave because of Senior's disputed aggression, this argument is without merit.  *See United States v. Chanthasouxat*, 342 F.3d 1271, 1279 (11th Cir. 2003) (internal quotation marks omitted) (holding that police are provided "broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justifications for their actions….The flip side of that leeway is that the legal justifications must be objectively grounded.").

[63] *See Terry*, 392 U.S. at 21.

arrest of Junior without probable cause.  As noted above, a warrantless arrest without probable cause violates the Constitution and provides a basis for a civil rights action, whereas "probable cause at the time of arrest constitutes an absolute bar to a § 1983 action for false arrest."[64]

In § 1983 actions involving arrests due to a mistaken identity, the Eleventh Circuit applies "the same 'reasonable mistake'" standard articulated by the Supreme Court in criminal cases: "'[w]hen the police have probable cause to arrest one party, and [ ] reasonably mistake[ ] a second party for the first party, then the arrest of the second party is a valid arrest.'"[65]  Thus, for purposes of § 1983 actions, an arrest based on a mistaken identity is valid in the Eleventh Circuit when (1) "the police have a valid warrant—as opposed to just probable cause—to arrest someone," and (2) the officers "mistakenly arrest someone else due to a misidentification."[66]

Here, Plaintiffs argue that Defendants' did not have a valid arrest warrant as to Junior.  This argument misunderstands the Court's inquiry, and, if applied, would wholly nullify a "reasonable mistake."  The main issue before the Court is whether it was reasonable for the officers to mistake Junior, for whom no probable cause to arrest existed, for Antonio, whom probable cause to arrest did exist.  Thus, the Court's initial

---

[64] *Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010).

[65] *Rodriguez*, 280 F.3d at 1346 (quoting *Hill v. California*, 401 U.S. 797, 802 (1971)) (section 1983 action involving an officer's on-the-scene decision to arrest someone he mistakenly thought was the subject of an active, valid warrant).

[66] *Id.*

concern and the first prong of the above test, is whether the outstanding warrants for Antonio were valid, not whether the officers had a valid arrest warrant as to Junior. Because Plaintiffs do not challenge the validity of Defendants' arrest warrants as to Antonio, the Court finds that Antonio's warrants are valid.[67]

Turning next to the second, critical issue in this claim, the Court considers whether Defendants' mistaken arrest of Junior—pursuant to the execution of valid arrest warrants for Antonio—was outside the scope of a reasonable mistake.  The Court "must evaluate the totality of the circumstances surrounding the arrest to determine its reasonableness."[68]

Under the facts in the light most favorable to Plaintiffs, the Court concludes the officers made a reasonable mistake when they arrested Junior pursuant to Antonio's warrants.  First, Junior and Antonio are of the same sex and race, and have the same physical characteristics known to the officers at the time of the arrest.  Additionally, their names, "Antonio Bernard Hill" and "Tony Hill, Jr.," are virtually "identical."[69] Both individuals have the same last name, and "Tony" is a common nickname for

---

[67] In the unlikely event Plaintiffs argue the warrants as to Antonio were invalid because the officers did not have them in their possession at the time of the arrest, the Court finds this argument to be without merit.  *See United States v. Bembry*, 321 F. App'x 892, 894 (11th Cir. 2009) ("There is no federal requirement that an officer have a warrant in hand or nearby when he is arresting a suspect.").

[68] *Rodriguez*, 280 F.3d at 1346-47 (internal citations omitted) (no constitutional violation where plaintiff had same name, sex, age, race, and other similar characteristics as suspect and only material difference was plaintiff was five inches taller); *see, e.g.*, *Chery v. Barnard*, No. 8:11-cv-2538-T-24TGW, 2012 WL 760618, at *4 (M.D. Fla. Mar. 8, 2012) (finding reasonable mistake when plaintiff had same name, age, and sex, and whose birth dates had transposing months and days); *Ainsworth v. City of Tampa*, No. 8:10-cv-293-T-TBM, 2011 WL 1791291, at *6-7 (M.D. Fla. May 10, 2011) (finding mistaken arrest of plaintiff who had same name, gender, birth year, and race as person sought in valid warrant, was reasonable mistake).

[69] *See Rodriguez*, 280 F.3d at 1350 (holding "Joe Rodriguez" was "identical" to "John Rodriguez").

22

"Antonio."  Finally, Plaintiffs' house was located in east Macon, the same area the officers believed Antonio lived.  All of this information corroborated Buck's tip that the suspect resided at the house.[70]

In addition to the distinction between "Antonio" and "Tony," the Court can find only three other distinctions between Antonio and Junior, none of which transform the officers' error into an unreasonable mistake.  First, "Jr." was appended to the end of Junior's name but not at the end of Antonio's name.  Second, Junior did not have a middle name, whereas Antonio's middle name was Bernard.  Although certainly relevant to the officers' consideration, the Court finds these minor distinctions insufficient to render the officers' mistake unreasonable.[71]  Third, Plaintiffs allege the Xerox picture of Antonio was distinguishable from Junior, so much so that Officer Rozier later concluded Junior was not Antonio "solely" by looking at the photograph.[72]  However, Plaintiffs fail to articulate any specific, identifiable differences visible in the photo of Antonio (or in the warrants) and on Junior that evening, such as tattoos, piercings, or birthmarks, that would render the mistaken

---

[70] *See Ortega*, 85 F.3d at 1525 ("the corroboration of the details of an informant's tip through independent police work adds significant value to the probable cause analysis"); *see also Jones v. United States*, 362 U.S. 257, 269 (1960) (An officer "may rely upon information received through an informant ... so long as the informant's statement is reasonably corroborated [through] other matters within the officer's knowledge.").

[71] *Rodriguez*, 280 F.3d at 1348; *see In re Haburjak*, 309 B.R. 170, 174 (W.D. Penn. 2004) ("[I]t has been ruled that the suffix 'Jr.' is not part of a man's name….").

[72] Rozier Dep. 64:24 [Doc. 39].

identification of Junior unreasonable.[73]  Without such distinctions, the Court finds the differences, if any, between Antonio's photo and Junior are negligible.  Indeed, it appears courts have considered even greater discrepancies to be "reasonable," including an obvious racial discrepancy.[74]

Given the officers' split-second determination and the circumstances in the light most favorable to Plaintiffs, the Court finds the above "small difference[s]" are insufficient to transform the officers' reasonable error into an unreasonable one.[75]  Accordingly, Defendants' actions fall squarely within the "reasonable mistake" standard.  Although Junior's arrest is undoubtedly unfortunate, it is not unconstitutional as "[t]he Constitution does not guarantee that only the guilty will be arrested…."[76]  Accordingly, the Court finds Junior's false arrest claim against Defendants fails as a matter of law.  Defendants' Motion for Summary Judgment as to Plaintiffs' false arrest claim is **GRANTED**.

    c.  Warrantless Entry

---

[73] *See Rodriguez*, 280 F.3d at 1344 (finding reasonable mistake when, in part, suspect had four tattoos and plaintiff had six tattoos).  The Court notes that various parts of the record indicate that Junior's shirt was off, exposing a tattoo on his chest.  However, because Plaintiffs deny that Junior's shirt was off while the officers were present and because there is no evidence to indicate that the officers believed Antonio did or did not have a tattoo in that location, the Court finds this arguement irrelevant.

[74] *See Chapman v. City of Atlanta, Ga*, 192 F. App'x 922, 924 (11th Cir. 2006) (reasonable mistake when only "glaring inconsistency" was plaintiff was white and suspect in warrant was black); *Johnson v. Miller*, 680 F.2d 39, 42 (7th Cir. 1982) (same).

[75] *Rodriguez*, 280 F.3d at 1348.

[76] *Baker v. McCollan*, 443 U.S. 137, 145 (1979).

To the extent Plaintiffs contend the officers made a warrantless entry into their house, the Court concludes the officers were entitled to enter for the limited purpose of effectuating the arrest. Although the officers did not have a valid warrant to arrest Junior, they did have valid arrest warrants as to Antonio.

Under the Fourth Amendment, a valid arrest warrant "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."[77] Thus a court makes a two-part inquiry: (1) "there must be a reasonable belief that the location to be searched is the suspect's dwelling," and (2) "the police must have reason to believe that the suspect is within the dwelling."[78] In considering whether the evidence satisfies this test, "[c]ourts must apply common sense and evaluate all the facts and circumstances known to the agents in determining whether a reasonable belief exists."[79]

Here, there is no evidence in the record to indicate the officers entered the house at any point before the arrest, and thus, the Court concludes the officers entered the house for the purpose of arresting Junior. Because the officers had a valid arrest warrant for Antonio, they were privileged to enter 352 Cowan Street if the officers had reason to believe the residence was Antonio's and that Antonio was home at the time

---

[77] *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995) (internal quotation marks and alterations to original omitted) (emphasis omitted).
[78] *Id.* (internal quotation marks omitted).
[79] *United States v. Jean*, 315 F. App'x. 907, 910–11 (11th Cir. 2009) (citing *United States v. Bervaldi*, 226 F.3d 1256, 1263 (11th Cir. 2000)).

of entry.   Reading the facts in the light most favorable to Plaintiffs, the Court concludes that the officers were privileged to enter Plaintiffs' home.

First, Junior immediately gave the officers reason to believe Antonio was in the house by opening the door, telling them his nearly identical name, and sitting on the couch directly in front of the open door—viewable to all of the officers on the porch. The officers also had reason to believe that Junior lived in the house because Junior went to the back of the house to retrieve two forms of identification.  Although a valid identification card could reasonably be expected on a guest, Junior also retrieved a high school identification card that was over five years old from within the house, a personal belonging that a resident, as opposed to a guest, could reasonably be expected to have with his belongings.  Based on a common sense assessment of the facts known to the officers in this case, the Court finds that it was reasonable to believe that the house was where Junior (and, thus, Antonio) lived.  Accordingly, Plaintiffs' warrantless entry claim against the remaining Defendants in their individual capacities fails as a matter of law, and Defendants' Motion for Summary Judgment as to this claim is **GRANTED**.

d.  Unlawful Seizure

Plaintiffs also appear to contend the officers unlawfully seized Senior during Junior's arrest.  Law enforcement officers may briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on

objective facts that the individual has engaged in, or is about to engage in, criminal activity.[80]   "[T]he 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'"[81]

Here, assuming the officers' actions of pushing Senior against the wall and yelling that he stay against the wall constituted a "seizure" under the Fourth Amendment, the Court concludes the temporary seizure was supported by reasonable suspicion of criminal activity.  When the officers detained Senior, they believed Junior was Antonio, contrary to Senior's earlier statements.  Thus, the officers were justified in detaining Senior as he had obstructed or hindered the officers' lawful discharge of their official duties.[82]  Accordingly, Defendants' Motion for Summary Judgment as to this claim is **GRANTED**.

e.  Excessive Force

Plaintiffs allege in their complaint that Defendants used excessive force to detain Junior in violation of the Fourth Amendment.   On summary judgment,

---

[80] *See Terry*, 392 U.S. at 21; *Harris*, 526 F.3d at 1337 (same); *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007) (same).

[81] *United States v. Mikell*, 102 F.3d 470, 474–75 (11th Cir. 1996) (citing *Terry*, 392 U.S. at 21); *see also United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must be judged against an objective standard: would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate.") (citations and internal quotations omitted).

[82] O.C.G.A. § 16-10-24 ("a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor"); *see Vadimsky v. City of Melbroune*, 270 F. App'x 924, 929 (11th Cir. 2008).

Defendants contend that the force used was objectively reasonable in light of the totality of the circumstances.   Plaintiffs neither offer a response to Defendants' argument nor address their excessive force claim.   Consequently, the Court deems this claim to be abandoned.[83]   Summary judgment with respect to Plaintiffs' excessive force claim is **GRANTED**.

2. *Fourteenth Amendment*

Arising from Defendants' mistaken arrest, Plaintiffs also appear to contend that Junior's Fourteenth Amendment rights were violated when he was detained. Although a person mistakenly arrested pursuant to a valid arrest warrant cannot be held indefinitely, a valid warrant does justify arrest and detention for some period of days.[84]  An official "executing an arrest warrant is [not] required by the Constitution to investigate independently every claim of innocence," even if "the claim is based on mistaken identity."[85]   Applying this standard, the Supreme Court has held that a period of three days over a holiday weekend "does not and could not amount to [a constitutional] deprivation."[86]

Here, pursuant to a valid arrest warrant, Junior was mistakenly arrested and detained for a time period of five <u>minutes</u>.   Certainly if a three-day detention "does

---

[83] *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).
[84] *Baker*, 443 U.S. at 144.
[85] *Id*. at 146.
[86] *Id*. at 144-45; *see Chapman*, 192 F. App'x at 925 (concluding that individual mistakenly arrested and held pursuant to a valid arrest warrant was not entitled to more process to review her claims of innocence because she was released from custody in less than twenty-four hours).

not and could not" rise to the level of a constitutional deprivation, a matter of minutes falls drastically short.   Accordingly, Plaintiff's false imprisonment claim under the Fourteenth Amendment fails as a matter of law.   Defendants' Motion with respect to this claim is therefore **GRANTED**.

   3.   *First Amendment*

   Plaintiffs also allege a claim under the First Amendment for the alleged "unconstitutional denial and suppression of the right of free speech and the right to question the conduct of police officers."[87]   Plaintiffs allege that an unknown officer retaliated against Senior when he asked the officers for their names and badge information.   As Defendants note in their Motion, this alleged suppression occurred <u>after</u> Junior had been released from handcuffs and the officers were leaving the house. Plaintiffs do not respond to this argument nor do they address their First Amendment claim in their Brief.   Consequently, the Court deems this claim to also be abandoned.[88] Summary judgment with respect to Plaintiffs' First Amendment claim is **GRANTED**.

   B.   <u>Individual Defendants in their Official Capacity</u>

   In their Motion, Defendants assert that the claims against individual Defendants in their official capacities are essentially claims against the City.   Thus, they contend that Plaintiffs' § 1983 claims against the City in its official capacity is redundant of Plaintiffs' § 1983 claims against individual Defendants in their official

---

[87] [Doc. 1-2 at 17].
[88] *Resolution Trust*, 43 F.3d at 599.

capacities.  Plaintiffs do not address this contention in their response.  For the reasons that follow, the Court agrees with Defendants.

When an officer is sued under section 1983 in his official capacity, "the suit is simply another way of pleading an action against an entity of which an officer is an agent."[89]  "Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents."[90]  Here, Plaintiffs have brought identical § 1983 claims against Defendants in their official capacity as the claims brought against the City.  Accordingly, summary judgment as to Plaintiffs' claims against individual Defendants' in their official capacity is **GRANTED**.

C.  <u>City of Macon</u>

The Supreme Court has placed strict limitations on municipal liability under section 1983.[91]  A municipality can only be liable if it is "at fault in some sense for establishing or maintaining the policy which causes the injurious result."[92]  It is not enough for a plaintiff to merely identify conduct properly attributable to the municipality; the plaintiff must also demonstrate that, through deliberate conduct, the municipality is the moving force behind the alleged injury.[93]

---

[89] *Busby v. City of Orlando*, 931 F.2d 764, 776 (internal quotation marks omitted).
[90] *Id.*
[91] *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).
[92] *Brooks v. Scheib*, 813 F.2d 1191 (11th Cir. 1987) (quotation marks and alterations omitted).
[93] *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 396, 404 (1997).

Here, the Court has concluded above that Plaintiffs have not suffered any constitutional injury as a matter of law. Accordingly, the Court need not consider the City's policies or procedures, and Defendant's Motion for Summary Judgment with respect to Plaintiffs' § 1983 claims against the City is **GRANTED**.

Finally, to the extent that Plaintiffs attempt to hold the City liable for the actions of Defendants Mayor Reichert and Chief Michael Burns in their official capacities, Plaintiffs failed to offer any arguments as to their liability aside from the officers' conduct, which the Court finds to be constitutional. Accordingly, the Court concludes that Plaintiffs have abandoned the claims against Defendants Reichert and Burns in their official capacities.[94] Defendant's Motion with respect to Defendant Reichert in his official capacity is **GRANTED**.

## II.  State Law Claims

Plaintiffs assert the following state law claims against Defendants: false imprisonment, assault and battery, trespass, and intentional infliction of emotional distress. Because Plaintiffs' state and federal claims arise from a common nucleus of operative fact, the Court will exercise supplemental jurisdiction over Plaintiffs' state law claims.[95]

### A.  Liability of the City of Macon

---

[94] *Resolution Trust*, 43 F.3d at 599.

[95] *See* 28 U.S.C. § 1367(a).

On summary judgment, Defendants assert the defense of sovereign immunity with respect to Plaintiffs' state law claims against the City.[96]   In their response, Plaintiffs concede that the City of Macon is immune from liability under sovereign immunity.  Accordingly, summary judgment is **GRANTED** with respect to Plaintiffs' state law claims against Defendant City of Macon.

B.  <u>Liability of Defendants in their Individual Capacity</u>

On summary judgment, Defendants contend that they are entitled to judgment as a matter of law as to Plaintiffs' state law claims due to official immunity.  Official immunity "provides that while a public officer or employee may be personally liable for his negligent ministerial acts, he may not be held liable for his discretionary acts unless such acts are willful, wanton, or outside the scope of his authority."[97]   Here, Plaintiffs do not dispute that Defendants were acting in the performance of their discretionary authority.   Accordingly, to pierce Defendants' official immunity, Plaintiffs must demonstrate that the officers acted with actual malice.

To determine whether an official acted with actual malice, a court must evaluate a defendant's subjective intent.  Actual malice "requires a deliberate intention to do wrong and denotes express malice in fact."[98]   Actual malice does not include

---

[96] *See Pearson v. City of Atlanta*, 231 Ga. App. 96, 101 (1998).
[97] *Gilbert v. Richardson*, 264 Ga. 744, 752 (1994).
[98] *Selvy v. Morrison*, 292 Ga. App. 702, 704 (quotations omitted).

32

"implied malice, or the reckless disregard for the rights and safety of others."[99]   The Court will address Plaintiffs' state law claims separately and, if necessary, in the context of Defendants' official-immunity assertion below.

    1.   *False Arrest, False Imprisonment, Assault and Battery*[100]

Plaintiffs assert claims of false arrest, false imprisonment, and assault and battery against Defendants.  Plaintiffs' entire argument, totaling less than 100 words, states that "it is far from established that the officer's actions were lawful or supported by probable cause."[101]   Rather than offering evidence to support this argument or to challenge Defendants' argument on summary judgment, Plaintiffs' response merely alleges that Defendants are incorrect.  Because the Court has concluded Defendants' actions are lawful and that they acted with probable cause, and because Plaintiffs fail to provide more than a mere conclusory allegation in support, Plaintiffs argument cannot withstand summary judgment.[102]   Accordingly, Plaintiffs' state law false arrest, false imprisonment, and assault and battery claims fail as a matter of law, and Defendants' Motion as to these claims is **GRANTED**.

    2.   *Trespass*

---

[99] *Id.*

[100] Because Plaintiffs group these claims in their Response, so too will the Court in its Order.

[101] [Doc. 29 at 18].

[102] *Sun v. Girardot*, 237 F. App'x 415, 417 (11th Cir. 2007) (citing *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000), *Sammons v. Taylor*, 967 F.2d 1533, 1544-45 n.5 (11th Cir. 1992)) ("this court has consistently held that conclusory allegations without specific supporting facts have no probative value, and are legally insufficient to defeat summary judgment); *Avirgan*, 932 F.2d at 1577.

A cause of action for the tort of trespass exists when a person <u>unlawfully</u> interferes with another person's right of enjoyment of private property.[103]   Under Georgia law, a state officer does not commit trespass when he acts within the scope of his official duties.[104]

Here, Defendants were acting within the scope of their official duties when they refused to leave Plaintiffs' property and entered Plaintiffs' home.  Moreover, there is no evidence that Defendants were acting with actual malice.  "Absent malice or intent to injure, no liability attaches to the officer's exercise of his lawful discretion even when the decision to effectuate the arrest is flawed."[105]   Accordingly, there is no question of fact regarding the issue of trespass to real property, and summary judgment as to Plaintiffs' trespass to property claim is **GRANTED**.

3. *Intentional Infliction of Emotional Distress*

Plaintiffs also allege a claim for intentional infliction of emotional distress against Defendants.  To recover for the intentional infliction of emotional distress under Georgia law, a plaintiff must prove each of the following elements: "(1) intentional or reckless conduct; (2) which is extreme and outrageous; and (3) caused emotional distress; (4) which is severe."[106]   If a plaintiff cannot satisfy all the elements

---

[103] O.C.G.A. § 51-9-1 (2004).

[104] *See Morton v. McCoy*, 204 Ga.App. 595, 596 (1992).

[105] *Reed v. DeKalb Cnty.*, 204 Ga. App. 83, 86-87 (2003).

[106] *Blockum v. Fieldale Farms Corp.*, 271 Ga. App. 591, 594 (2005) (internal quotation marks omitted).

of his or her intentional infliction of emotional distress claim, the defendant is entitled to summary judgment.[107]

Here, Plaintiffs have not produced sufficient evidence of the fourth element; namely, that emotional harm suffered was severe.

> [E]motional distress includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea.  It is only where it is extreme that liability arises.  The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it.[108]

"Whether severe emotional distress can be found, based on the evidence presented, is a question for the court to decide."[109]

With respect to Junior, Plaintiffs fail to cite to any evidence that Junior suffered emotional distress, let alone severe emotional distress.   Accordingly, to the extent Junior asserts an intentional infliction of emotional distress claim, this claim fails as a matter of law.

With respect to Senior, Plaintiffs' cite to Senior's testimony that he is fearful of and distrusts the police and that he has trouble sleeping.  Although sleeplessness and anxiety are certainly unpleasant, they are not so severe that no reasonable person could be expected to endure them.[110]  Additionally, Senior's testimony that his seizures

---

[107] *See Gwinnett Health Sys., Inc. v. Delu*, 264 Ga. App. 863, 868  (2003).

[108] *Peoples v. Guthrie*, 199 Ga. App. 119, 121 (1991).

[109] *Abdul-Malik v. AirTran Airways, Inc.*, 297 Ga. App. 852, 858 (2009).

[110] *See Witter v. Delta Airlines*, 966 F. Supp. 1193, 1201 (N.D. Ga. 1997) (anxiety, sleeplessness, overeating, diarrhea and headaches, were not "severe" for purposes of intentional infliction of emotional distress claim).

increased do not rise to the level of severity required under the law because he did not consult his physician about this increase.[111]   Accordingly, the Court finds Plaintiffs' intentional infliction of emotional distress claim fails as a matter of law, and Defendants' Motion with respect to Plaintiffs' intentional infliction of emotional distress claim is hereby **GRANTED**.

4.   *Punitive Damages*

Having concluded that Plaintiffs' § 1983 claims and state law claims fail as a matter of law, Plaintiffs' claim for punitive damages also fails as a matter of law.[112] Therefore, Defendants' Motion is **GRANTED** with respect to this claim.

## CONCLUSION

Based on the foregoing, the Court concludes Plaintiffs' 42 U.S.C. § 1983 claims and state law claims fail as a matter of law.   Accordingly, Defendants' Motion for Summary Judgment [Doc. 20] is **GRANTED**, and the instant action is hereby **DISMISSED**.


**SO ORDERED,** this 15th day of February, 2013.

S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

LMH/bbp/ssh

---

[111] *See also Odem v. Pace Academy*, 235 Ga.App. 648, 656 (1998) (where plaintiff suffered "marginally high" blood pressure but sought no professional advice, emotional distress was not severe).
[112] *Allen v. Elbert Cnty.*, No. 3:09-CV-66 (CDL), 2012 WL 1257568, at 6 n.3 (M.D. Ga. Mar. 25, 2010).